**NATIONAL WILDLIFE FEDERATION, et al., Appellees,**

v.

**Manuel LUJAN, Jr., et al., National Coal Association and American Mining Congress, Appellants. (Two Cases)**

**Nos. 90–5114, 90–5118.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 7, 1991.

Decided March 22, 1991.

---

Before WALD, BUCKLEY and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Concurring opinion filed by Circuit Judge WALD.

WALD, Circuit Judge:

The National Wildlife Federation and other environmental groups (hereinafter "NWF") brought suit challenging regulations promulgated by the Secretary of the Interior ("Secretary") under the Surface Mining Control and Reclamation Act of 1977 ("SMCRA" or "Act"), 30 U.S.C. § 1201 *et seq.* The National Coal Association and the American Mining Congress (hereinafter "Industry") intervened as defendants and supported the Secretary's regulations. NWF and the Secretary both moved for summary judgment, and the district court granted the motion of each in part. *National Wildlife Federation v. Lujan,* 733 F.Supp. 419 (D.D.C.1990). Industry now appeals the part of the district court order that invalidated two of the challenged regulations.[1] Because we hold that the challenged regulations are based on a reasonable interpretation of the SMCRA and are not arbitrary and capricious, we reverse.

## I. SUBSIDENCE CONTROL REGULATION

### A. *Background*

"Subsidence occurs when a patch of land over an underground mine sinks, shifts, or otherwise changes its configuration." *National Wildlife Federation v. Hodel,* 839 F.2d 694, 739 (D.C.Cir.1988). The SMCRA directs the Secretary to promulgate rules to prevent material damage from subsidence. 30 U.S.C. § 1266(a). The original regulation, promulgated in 1979, required an underground coal operator to restore land materially damaged by subsidence and

L. Thomas Galloway, with whom Glenn P. Sugameli, Washington, D.C., for National Wildlife Federation, and Thomas J. Fitzgerald, Frankfort, Ky., for Kentucky Resources Council, Inc., were on the joint brief for appellees in both cases.

John A. Macleod, with whom Thomas C. Means, Harold P. Quinn, Jr., Edward M. Green and Stuart A. Sanderson, Washington, D.C., were on the joint brief for appellants National Coal Ass'n and American Mining Congress in both cases. J. Michael Klise, Washington, D.C. also entered an appearance for appellants.

---

1. Although NWF challenged several other SMCRA regulations in the district court, this appeal involves only the regulation governing subsidence damage to structures, 30 C.F.R. § 817.121(c) (1989), and the regulation establishing the effective date of the regulation of off-site physical processing facilities, *id.* § 827.13.

to repair each damaged structure, to purchase the damaged structure at fair market value, or to compensate the owner for the diminution in value. 30 C.F.R. § 817.124 (1979) (published in 44 Fed.Reg. 14,902 (Mar. 13, 1979)). In 1983, however, the Secretary modified the rule, retaining the operator's duty to restore land damaged by subsidence, but requiring the correction of material subsidence damage to structures only to the extent required by state law. 30 C.F.R. § 817.121(c) (1983) (published in 48 Fed.Reg. 24,638 (June 1, 1983)).

After the district court sustained a procedural challenge to the 1983 regulation, *In re Permanent Surface Mining Regulation Litigation,* 21 Env't Rep. Cas. (BNA) 1724, 1730–31 (D.D.C.1984) (hereinafter *PSMRL* ), *aff'd in part sub nom. National Wildlife Federation v. Hodel,* 839 F.2d 694 (D.C.Cir.1988), the Secretary again proposed the regulation in substantially the same form in 1985. 50 Fed.Reg. 27,910 (July 8, 1985). The final rule, adopted in 1987 and challenged by NWF in this case, provides that an underground coal operator shall:

> To the extent required under applicable provisions of State law, either correct material damage resulting from subsidence caused to any structures or facilities by repairing the damage or compensate the owner of such structures or facilities in the full amount of the diminution in value resulting from the subsidence. Repair of damage includes rehabilitation, restoration, or replacement of damaged structures or facilities. Compensation may be accomplished by the purchase prior to mining of a non-cancellable premium-prepaid insurance policy.

52 Fed.Reg. 4,860, 4,868 (1987) (codified at 30 C.F.R. § 817.121(c)(2) (1989)) (emphasis added). NWF objects to the italicized language of the first clause of the regulation—the so-called "state law limitation" on the operator's obligation to correct material subsidence damage to structures. NWF contends, and the district court held, that this state law limitation is inconsistent with the SMCRA because the Act requires the operator to correct *all* material subsidence damage to structures, even if the operator has no similar duty under state law. 733 F.Supp. at 426. Although the Secretary is not appealing this decision, Industry is.

### B. Statutory Analysis

█ We evaluate the Secretary's regulations under the standards set forth by the Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Although both NWF and Industry argue that the SMCRA clearly indicates that Congress directed the Secretary to adopt regulations implementing their respective interpretations, we disagree. For the following reasons, we find that the regulation governing subsidence damage to structures is based on a reasonable interpretation of the SMCRA and is not arbitrary and capricious. Accordingly, we reverse the contrary district court holding.[2]

The parties agree that the validity of the Secretary's subsidence control regulations depends primarily upon the interpretation of § 516 of the Act, which states in relevant part:

> (a) The Secretary shall promulgate rules and regulations ... embodying the following requirements....

---

**2.** In proceeding to the merits, we reject NWF's contention that the issue is moot. As discussed above, the Secretary has not appealed from the district court's holding that the subsidence control regulation is contrary to the SMCRA. In addition, the Secretary has complied with the district court's order by directing the States, pursuant to 30 C.F.R. § 732, to amend their subsidence regulations to conform to the Act, as interpreted by the district court. *See, e.g.,* 55 Fed.Reg. 40,678 (Oct. 4, 1990) (in response to Secretary's request, Virginia proposed to amend its rules governing subsidence to require an operator to repair or compensate the owner for

subsidence damage to structures without regard to state law limitations on liability); *id.* at 11,- 619 (disapproving of Oklahoma's proposed subsidence control rule because the state law limitation makes it less stringent than the Act). But because the Secretary has not promulgated a new regulation removing the state law limitation in the current regulation, Industry could benefit from an appellate decision reversing the district court's interpretation of the Act and upholding the current regulation. Therefore, the issue is not moot. *See Center for Science in the Public Interest v. Regan,* 727 F.2d 1161, 1165 (D.C.Cir.1984).

(b) Each permit issued under any approved State or Federal program ... shall require the operator to:

(1) adopt measures consistent with known technology in order to prevent subsidence causing material damage to the extent technologically and economically feasible, maximize mine stability, and maintain the value and reasonably foreseeable use of such surface lands, except in those instances where the mining technology used requires planned subsidence in a predictable and controlled manner....

30 U.S.C. § 1266. Nevertheless, the parties strenuously disagree about the nature of the duties imposed by this section. NWF, like the Secretary and the district court below, interprets § 516(b)(1) as providing that each permit shall require the operator to do three separate things, *i.e.,* to (1) adopt measures consistent with known technology to prevent subsidence causing material damage to the extent technologically and economically feasible; (2) maximize mine stability; and (3) maintain the value and reasonably foreseeable use of surface lands. *See* 52 Fed.Reg. 4,860, 4,863 (Feb. 17, 1987); 733 F.Supp. at 427. As discussed below, NWF further argues that the state law limitation in the subsidence control regulations impermissibly limits the operator's first and third duties.

Although disagreeing that the state law limitation is inconsistent with these duties, Industry first raises a more fundamental challenge to the Secretary's and NWF's interpretation of § 516(b)(1). In Industry's view, § 516(b)(1) provides that each permit shall require the operator to do only one thing, *i.e.,* to adopt measures consistent with known technology, in order to further three purposes, *i.e.,* the (1) prevention of subsidence causing material damage to the extent technologically and economically feasible; (2) maximization of mine stability; and (3) maintenance of the value and reasonably foreseeable use of surface lands. Because the clauses of § 516(b)(1) do not impose three independent duties, Industry reasons, the district court erred in holding that the state law limitation in the subsi-

dence regulations is inconsistent with two of these duties.

■ In our view, the language, structure, and punctuation of § 516(b)(1) is unclear. Although it is possible to interpret the clauses in § 516(b)(1) as Industry suggests, the Secretary's and NWF's interpretation is also a reasonable one. Moreover, we previously upheld a different section of the subsidence control regulations that was also based on the premise that each of the clauses in § 516(b)(1) impose a separate duty on operators. *Hodel,* 839 F.2d at 741. In *Hodel,* we agreed with the Secretary that

[s]ection 516(b)(1) requires the mine operator to "maintain the value and reasonably foreseeable use" of the land. For the Secretary to construe that language as authorizing a regulation requiring the restoration of subsided land is certainly not inconsistent with the section's language: "maintaining the value" of land may well require restoring it after it has been damaged.

*Id.* We therefore reject Industry's contention that the Secretary may not interpret § 516(b)(1) as imposing three separate duties on mine operators, and we proceed to evaluate the district court's holding that the current subsidence regulations contravene two of these duties.

■ As mentioned above, the district court held, and NWF now argues on appeal, that two clauses of § 516(b)(1) specifically require underground mine operators to correct material damage to structures. 733 F.Supp. at 426. We disagree. First, contrary to NWF's argument, the requirement in § 516(b)(1) that an operator shall "[a]dopt measures consistent with known technology in order to prevent subsidence causing material damage to the extent technologically and economically feasible" does not on its face require the Secretary to impose on operators a duty to compensate for subsidence damage. Instead, as Industry notes, there is a question of whether this language even authorizes the Secretary to impose such a duty. An agency's authority to require the prevention of damage does not necessarily include the

authority to require compensation for damage. *See South Carolina Public Service Authority v. Federal Energy Regulatory Commission,* 850 F.2d 788, 792–93 (D.C. Cir.1988). We have recognized, however, that in the absence of a congressional expression of intent on the matter, an agency's power to require licensees to prevent property damage might include the power to require licensees to compensate for such damage if the compensation scheme is essential to achieving the purposes of the statute. *Id.* at 793.

■ In this case, the district court concluded that the operators' duty to compensate for subsidence damage to structures is essential to the SMCRA scheme to prevent subsidence.[3] According to the district court,

> [t]he effect of industry's interpretation of this area of the statute would be to allow the dictates of section 516(b)(1) to be rendered virtually meaningless. A coal operator would have to indicate that he is taking measures to prevent subsidence in order to obtain a permit. Once mining was underway, there would be nothing in the Act to stop the operator from abandoning these measures....

733 F.Supp. at 427 (quoting *PSMRL,* at 1728–29 n. 4). That statement is inaccurate. When the Secretary determines that an operator is violating a permit, he is required to direct the operator to abate the violation and, if the operator does not comply, order a cessation of mining or, if necessary, revoke the permit. 30 U.S.C. § 1271(a)(3), (4). The Secretary may also assess civil penalties for permit violations.

*Id.* § 1268(a). Because, even under the current regulations, an operator cannot say that he will take measures to prevent subsidence in order to get a permit and then violate the permit conditions with impunity, we decline to hold that the operators' duty to compensate for all subsidence damage to structures is essential to the SMCRA scheme to prevent subsidence.

Second, the district court held that the subsidence regulation contravened the requirement in § 516(b)(1) that operators "maintain the value and reasonably foreseeable use of surface lands."[4] 733 F.Supp. at 427. The district court's holding is, however, in some tension with *Hodel,* in which this court held that the Secretary's conclusion that the restoration of land materially damaged by subsidence was necessary to "maintaining [its] value" was based on a reasonable interpretation of "the general and ambiguous terms of § 516(b)(1)." 839 F.2d at 741. Because *Hodel* stands for the proposition that § 516(b)(1) gives the Secretary the discretion to impose a duty to restore surface lands, it can hardly now be read to require the Secretary to impose a duty to restore structures, which are not even specifically mentioned in § 516(b)(1).

■ Thus, contrary to NWF's argument, we do not find that § 516(b)(1) specifically requires the Secretary to impose a duty to restore structures damaged by subsidence. On the other hand, we also find unpersuasive Industry's argument that § 516(b)(1), which requires operators to "maintain the value and reasonably foreseeable use of surface *lands,*" prohibits the Secretary from requiring the restoration of *struc-*

---

3. The district court also thought that the state law limitation is inconsistent with one of the purposes of the SMCRA: to "assure that the rights of surface landowners and other persons with a legal interest in the land or appurtenances thereto are fully protected from such operations." 30 U.S.C. § 1202(b). Although the Secretary could rely on this purpose, in conjunction with § 516(b)(1)'s requirement that operators "maintain the value and reasonably foreseeable use of surface lands," to promulgate a regulation imposing an obligation to repair subsidence damage to structures, we do not find that it constitutes the clear specific congressional intent to justify holding that the Secretary *must* promulgate such a regulation.

4. The court reasoned that

> the value of land is tied to the value of structures on it, and the use of land mostly depends upon the structures it can support. It is unclear how either surface land's value or its reasonably foreseeable use can be maintained when structures on the surface land— which give the land much of its value and define its use—may be damaged by subsidence *without such harm having to be corrected.*

733 F.Supp. at 427.

*tures.* Instead, we think that the Secretary could reasonably find that the restoration of structures is necessary to maintain the "reasonably foreseeable use of surface lands." In fact, the Secretary agrees that such an interpretation is possible. *See* 50 Fed.Reg. 27,910, 27,911 (July 8, 1985) (The Secretary "is not asserting that [he] could not impose [a requirement that operators restore damaged structures], but only that the law does not require it and that such a sweeping responsibility is inappropriate.").

■ Industry also argues that the structure of the SMCRA indicates that § 516(b)(1) does not authorize the Secretary to require the repair of structures damaged by subsidence. Section 516(b)(1), they argue, only sets forth performance standards, while remedies are contained in other sections of the Act. But that argument is foreclosed by *Hodel*, in which we upheld the authority of the Secretary, under § 516(b)(1), to impose not only performance standards (*e.g.*, the prevention of material subsidence damage to the extent technologically and economically feasible), but also a remedy (*e.g.*, the restoration of subsided land). 839 F.2d at 739–41.

### C. *Reasonableness of the Regulations*

■ Because the SMCRA does not evince a clear congressional intent on the issue of whether coal operators must repair structures damaged by subsidence, the question becomes whether the Secretary's regulation is based on a permissible interpretation of the Act and is not an arbitrary or capricious change in policy. *See Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2781–82; *Motor Vehicle Manufacturers Association v. State Farm Mutual Auto Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). As the statutory analysis discussed above indicates, the Secretary's regulations are based on a permissible interpretation of the Act. In addition, they are not arbitrary and capricious.

The Secretary explained both the legal and policy reasons for amending the 1979 regulations to make operators' liability for subsidence damage to structures conditional on state law. *See* 52 Fed.Reg. 4,860,

4,863–66 (Feb. 17, 1987). When he promulgated the initial regulations in 1979, the Secretary stated that the compensation requirement was "mandated by the Act's requirement for maintenance of the surface's value and reasonably foreseeable use." 44 Fed.Reg. 14,902, 15,275 (Mar. 13, 1979). But when he revised the regulations in 1987, the Secretary had changed his mind, arguing that "[t]his provision does not of itself require the restoration of structures damaged by subsidence." 52 Fed.Reg. 4,860, 4,863 (Feb. 17, 1987). He then went on to analyze other related provisions of the SMCRA, concluding finally that "the Surface Mining Act does not *require* operators to repair subsidence-caused material damage to structures irrespective of state law." *Id.* (emphasis added). For the reasons discussed above, we agree with the interpretation adopted by the Secretary in the 1987 regulations.

We also find that the Secretary adequately explained his policy reasons for retaining the initial rule's protection for land, while modifying the protection for structures. The Secretary explained that:

> [w]hen an underground mine operator purchases from the surface owner the right to subside the land, or in conveying surface property reserves the right to subside the surface, the individual's property rights are protected, but the long term public interest in the land is not protected. Thus, § 817.121(c)(1) functions to prevent this injury to the land by assuring that in all cases, irrespective of private contract, this valuable natural resource will be restored to its premining capabilities, to the extent technologically and economically feasible. On the other hand, no environmental or public interest exists in protecting a building or structure where its present or past owner has either conveyed or waived a right to subjacent support.... In such an instance, the parties have worked out a mutually agreeable solution to account for private damage. The operator should not have to recompensate the surface owner. This final rule leaves this determination

of the relative rights and liabilities to state law.

While private parties may not be motivated to protect the environment, they have a great incentive to protect structures that they own.

*Id.* at 4,863–64.

NWF contends that because there is a strong public interest in protecting both land and structures from material subsidence damage, this distinction between land and structures runs counter to the purposes of the SMCRA. We are not persuaded. Although NWF correctly recognizes that the public may have an interest in protecting privately-owned structures, the Secretary may conclude, in the absence of an explicit congressional directive, that this public interest does not outweigh private property and contract rights.[5]

■ In sum, because the subsidence regulation is based on a permissible interpretation of the SMCRA, and because the Secretary adequately explained the legal and policy grounds for modifying the initial regulation, we reject NWF's challenge to the regulation and reverse the contrary district court holding.

## II. COAL PREPARATION REGULATION

### A. *Background*

Industry also appeals from the district court's holding that the rule establishing the effective date of regulation of off-site physical processing facilities is contrary to the Act. This dispute emanates in part from the now settled but formerly contested question of whether off-site physical

processing must be included within the definition of "surface coal mining operations" under § 701(28) and thus subjected to the permitting, performance, and reclamation provisions of the Act.[6]

In 1983, the Secretary promulgated a regulation defining "coal processing" or "coal preparation" as "the cleaning, concentrating, or other processing or preparation of coal in order to separate coal from its impurities." 30 C.F.R. § 701.5 (1984) (published in 48 Fed.Reg. 20,392, 20,400 (May 5, 1983)). The Secretary simultaneously promulgated regulations specifying the permitting and performance standards that off-site "coal processing" or "coal preparation" plants must follow. *See* 30 C.F.R. §§ 785.21, 827.12 (1984) (published in 44 Fed.Reg. 20,392, 20,401–02 (May 5, 1983)). However, because the Secretary interpreted the words "in situ" in § 701(28) as modifying "physical processing," he concluded that physical processing plants that crush, screen, and size coal, *i.e.*, plants that did not separate out impurities, qualified as "surface coal mining operations" subject to the Act only if they were located at or near the mine. 48 Fed.Reg. at 20,395–96.

Industry subsequently challenged these regulations in court, contending that only on-site coal processing plants are "surface coal mining operations" within the meaning of § 701(28). NWF simultaneously challenged the regulations on different grounds, arguing that physical processing facilities should be regulated as "coal processing" facilities even though they do not separate coal from its impurities. Agreeing with NWF, the district court held that

---

**5.** *Keystone Bituminous Coal Assoc. v. DeBenedicts,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1986), is not to the contrary. In enacting the statute involved in that case, the Pennsylvania legislature clearly decided that the public interest in protecting structures superseded private property and contract rights and expressly imposed an obligation to restore structures damaged by subsidence. The SMCRA, in contrast, does not expressly impose an obligation to restore structures.

**6.** Section 701(28) states in relevant part:
"surface coal mining operations" means—
(A) activities conducted on the surface of lands in connection with a surface coal

mine.... Such activities include ... in situ distillation or retorting, leaching or other chemical or physical processing, and the cleaning, concentrating, or other processing or preparation, loading of coal for interstate commerce *at or near the mine site* ...; and
(B) the areas upon which such activities occur or where such activities disturb the natural land surface. Such areas shall also include ... repair areas, storage areas, processing areas, shipping areas and other areas upon which are sited structures, facilities, or other property or materials on the surface, resulting from or incident to such activities[.]
30 U.S.C. § 1291(28).

the definition of "coal processing" and "coal preparation" was based on a misreading of the statute because it left unregulated those facilities that engaged in the off-site physical processing of coal. *PSMRL* at 1200–01. The district court also rejected Industry's contention that the Secretary lacked authority to regulate off-site coal processing facilities. *Id.* at 1200.

Instead of appealing from the decision, the Secretary in 1987 expanded the definition of "coal preparation" so that "facilities in connection with a coal mine which do not separate coal from its impurities but which otherwise engage in physical or chemical processing (*i.e.*, crushing, screening, and sizing facilities) will be regulated as coal preparation plants." 52 Fed.Reg. 17,724, 17,725 (May 11, 1987); *see also* 30 C.F.R. § 701.5 (1989).[7] By expanding the "coal preparation" definition in this manner, the Secretary made it clear that even off-site processing facilities that do not separate coal from its impurities must comply with the performance standards and the permitting and reclamation requirements of the Act. However, the Secretary decided to apply the expanded "coal preparation" definition only to those processing facilities in operation on July 6, 1984, the date of the *PSMRL* decision. *See* 52 Fed.Reg. at 17,-727–28; 30 C.F.R. §§ 785.21, 827.12, 827.13 (1989). In other words, the Secretary decided not to regulate off-site coal preparation plants that were not regulated under the 1983 coal preparation definition and that ceased operating before July 6, 1984. 52 Fed.Reg. at 17,728.

While the Secretary was expanding the definition of "coal preparation" in response to the district court's decision, Industry appealed the portion of the *PSMRL* decision holding that the Secretary had jurisdiction to regulate off-site processing or preparation facilities. Shortly after the Secretary promulgated the 1987 "coal preparation" regulations, this court upheld the 1983 regulations governing off-site coal preparation plants and rejected Industry's contention that § 701(28) of the Act only

authorizes the Secretary to regulate processing facilities "at or near the mine." *Hodel,* 839 F.2d at 743–45. While recognizing that § 701(28) could be read narrowly as Industry contended, the court held that § 701(28) did not "preclude the reasonable interpretation adopted by the Secretary and sustained by the district court." *Id.* at 745.

This case involves NWF's challenge to the Secretary's 1987 regulations that declined to regulate off-site processing facilities that were not included in the 1983 coal processing definition and that ceased operating before the *PSMRL* decision in July 1984. Agreeing with NWF, the district court in this case held that the Secretary violated the Act by failing to apply the coal preparation performance standards to all coal preparation facilities that have operated subsequent to the enactment of the SMCRA. 733 F.Supp. at 435. Again, Industry appeals, although the Secretary does not.

### B. *Analysis*

█ The district court held that the Secretary had to regulate off-site crushing, screening, and sizing facilities from the effective date of the Act because the Act requires the Secretary to regulate these facilities. *Id.* at 436. Our precedent, however, establishes that § 701(28) gives the Secretary the *discretion* to regulate off-site coal preparation facilities. Because we find that the Secretary reasonably exercised his discretion in limiting regulation of off-site physical processing facilities to those in operation after July 6, 1984, we uphold the regulations and reverse the district court.

In holding that the Secretary's regulations violated the Act, the district court reasoned that: (1) the Secretary "may not decline to exercise authority over activities that the statute defines as surface coal mining operations, particularly coal processing;" (2) the court previously held in *PSMRL* that facilities that crush, screen, and size coal must be included in the definition of "coal processing"; (3) therefore, the

---

7. Although the 1983 rule used the term "coal processing or coal preparation," the 1987 amendments used only the term "coal preparation." 52 Fed.Reg. at 17,726.

Secretary may not decline to exercise authority over *any* facilities that crush, screen, or size coal. *Id.* The problem with this syllogism is that the first premise was partially rejected in *Hodel*, in which we held that the Act does not require the Secretary to regulate *all* coal processing or preparation facilities. Instead, we held that the Secretary's decision to regulate off-site coal preparation plants was based on a reasonable, but discretionary, interpretation of § 701(28). 839 F.2d at 744–45. Because the Act permits, but does not require, the Secretary to regulate off-site coal preparation plants, and because plants that crush, screen, and size coal are coal preparation plants, the Act permits, but does not require, the Secretary to regulate off-site facilities that crush, screen, and size coal. Thus, the district court erroneously held that the Secretary violated the Act by declining to regulate all off-site physical processing plants that operated subsequent to the enactment of the Act.

NWF disagrees with this analysis, arguing that this court cannot affirm the coal preparation regulations based on the fact that the Secretary has the discretion to regulate off-site crushing, screening, or sizing facilities because the Secretary conceded that he had jurisdiction to regulate off-site crushing, screening, and sizing facilities that ceased operating before the *PSMRL* decision, *see* 52 Fed.Reg. at 17,728. Therefore, NWF argues, the Secretary had to regulate from the date of enactment of the Act, not the date of the *PSMRL* decision. We disagree. In our view, the Secretary's concession that he had jurisdiction to regulate from the date of enactment of the Act is not dispositive. As we implicitly recognized in *Hodel*, the fact that the Secretary may regulate these facilities does not mean that he must regulate them. As long as the Secretary gives valid reasons for declining to regulate these facilities, his decision must be upheld.

NWF also asserts that the Secretary's reasons for declining to regulate off-site physical processing plants that ceased operations before the *PSMRL* decision are inadequate. NWF points out that the Secretary did not claim that physical processing facilities should inherently be treated differently from other coal processing facilities; he declined to regulate off-site physical processing facilities that ceased operations before the *PSMRL* decision only because he thought that it would be "inequitable" to regulate them after they had gone out of operation. 52 Fed.Reg. at 17,728. This reasoning is flawed, NWF contends, because once the Secretary decided to regulate off-site physical processing plants along with other off-site coal preparation plants, he could not "selectively" decline to regulate those off-site physical processing plants that ceased operating before July 6, 1984.

We cannot agree with NWF's suggestion that once the Secretary agreed with the district court in *PSMRL* that off-site physical processing plants should be regulated as off-site coal preparation plants, the Secretary lacked the discretion to exempt some off-site physical processing plants from regulation. Although the Secretary could not arbitrarily decide to regulate some plants and not others, the Secretary in this case did not do that. In deciding not to regulate off-site physical processing plants that ceased operations before July 6, 1984, the Secretary weighed several factors. First, he explained that "[f]rom an environmental standpoint, the question of retroactivity relates solely to the reclamation of non-waste-generating facilities which ceased operating prior to July 6, 1984. Generally, such reclamation would involve the removal of abandoned structures that likely are not currently causing large amounts of pollution." *Id.* Second, tracing the history of the regulation of off-site physical processing facilities, the Secretary found that it was unclear under the initial regulations (in effect from 1979 to 1983) whether off-site physical processing facilities were subject to regulation.[8]

---

**8.** The Secretary explained that
the 1979 preamble contained a statement that the term "surface coal mining operations" was easily interpreted to include crushing and screening and there was no need to expressly include those activities in the definition.

Then, from 1983 until the *PSMRL* decision in July 1984, the regulations clearly stated that off-site physical processing facilities would not be regulated. Thus, the Secretary concluded, "[p]rior to the district court decision, operators of such facilities could have reasonably believed that the [regulatory] program did not apply to them during their period of operation and they could have made business decisions in reliance upon those beliefs." *Id.* Finally, the Secretary found that regulating off-site physical facilities that ceased operations prior to July 6, 1984, "would require regulatory authorities to locate all such facilities, find the persons responsible for the operations of such facilities, and attempt to compel reclamation at those sites. Requiring such efforts in the face of the settled expectation of persons who have concluded their operations is not warranted in this instance." *Id.*

NWF challenges this reasoning, contending that it is not inequitable to regulate off-site physical processing facilities that ceased operations before July 6, 1984, because, given the uncertainty in the initial regulations, the operators should have guessed that these facilities might be regulated. *See also* 733 F.Supp. at 437. We are not persuaded, however, that the Secretary's decision is unreasonable. While the 1983 regulations were in effect, operators of off-site physical processing facilities certainly could have ceased operations under the assumption that they were not subject to regulation. Similarly, those operators who ceased operations between 1979 and 1983 while the regulations were unclear about their inclusion could have concluded that they were not subject to regulation and that any future clarifying regulations would affect only facilities that continued to operate. The equities of subsequently declaring them subject to regulation are decidedly problematical.

■ More importantly, in declining to regulate off-site processing facilities that ceased operations before July 6, 1984, the Secretary considered enforcement costs and environmental benefits, as well as the operators' expectations. We cannot say that the balance he struck is unreasonable. Consequently, we hold that the Secretary reasonably concluded that regulating off-site physical processing plants that ceased operations before July 6, 1984 "would not further public policy in light of the nature both of the Surface Mining Act and its application prior to the District Court decision." 52 Fed.Reg. at 17,728.[9]

### III. CONCLUSION

In sum, we hold that the Secretary's subsidence control regulations are based on a reasonable interpretation of the statute and are not arbitrary and capricious. We also hold that the Secretary reasonably exercised his discretion in regulating off-site physical processing facilities from the date of the *PSMRL* decision, instead of the effective date of the Act. We therefore reverse the contrary district court holdings.

*It is so ordered.*

WALD, Circuit Judge, concurring:

As the panel recognizes, the district court held that the Secretary must require operators to compensate for all subsidence damage to structures because otherwise an operator could promise to take measures to prevent subsidence in order to get a permit, but could then abandon those measures and cause the subsidence damage that Congress enacted the SMCRA to prevent. *See*

---

However, there were no provisions in the regulations under which only crushing and screening away from the mine site were clearly regulated. For instance, [the] definition of coal processing plant in that same rule required that such plants separate coal from its impurities. A reader could have concluded that crushing or screening operations away from the mine site were not surface coal mining operations because they were not processing.

52 Fed.Reg. at 17,728.

9. Given this holding, we need not address Industry's alternative arguments that the Secretary would engage in retroactive rulemaking if he regulated off-site physical processing facilities from the effective date of the Act and that the SMCRA does not authorize the Secretary to promulgate retroactive rules.

*National Wildlife Federation v. Lujan,* 733 F.Supp. 419, 427 (D.D.C.1990). The panel explains that, even in the absence of a rule requiring operators to compensate for all subsidence damage to structures, an operator may not violate his permit with impunity because the Secretary may impose fines or revoke the permit if the operator violates its terms and conditions. I agree. But I also believe that § 520(f) of the Act provides a remedy for those injured by an operator's permit violations and reinforces our holding that the Secretary need not require operators to compensate for all subsidence damage to structures.

> Section 520(f) of the Act provides that [a]ny person who is injured in his person or property through the violation by any operator of any rule, regulation, order, or permit issued pursuant to this chapter may bring an action for damages (including reasonable attorney and expert witness fees) only in the judicial district in

which the surface coal mining operation complained of is located. Nothing in this subsection shall affect the rights established by or limits imposed under State Workmen's Compensation laws.

30 U.S.C. § 1270(f). In enacting § 520(f), Congress ensured that operators will bear the costs of subsidence damage to structures caused by permit violations: by its terms, § 520(f) makes an operator liable to any person whose person or property is injured because the operator failed to comply with the conditions of the mining permit. *See* H.R.Conf.Rep. No. 493, 95th Cong., 1st Sess. 110 (1977), *reprinted in* 1977 U.S.CODE CONG. & ADMIN.NEWS 593, 728, 741 (§ 520(f) "establishes a right of action for injuries resulting from an operator's violation of any rule, regulation or order or permit issued under the act"); *Laurel Pipe Line Co. v. Bethlehem Mines Corp.,* 624 F.Supp. 538, 539 (W.D.Pa.1986).[1]

1. I recognize that § 520(f), like every other provision of the SMCRA, does not technically apply in states that have assumed exclusive jurisdiction over the regulation of surface mining and reclamation operations. That does not mean, however, that a person injured by a violation of a permit issued by a state pursuant to the state law equivalent of the SMCRA has no remedy. Instead, the person's cause of action will be in state court under the state law equivalent of § 520(f). A brief explanation of the structure of the SMCRA explains why this is true.

Although the purpose of the SMCRA was to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations," 30 U.S.C. § 1202(a), the SMCRA allows states "to assume exclusive jurisdiction over the regulation of surface coal mining and reclamation operations" if the Secretary finds that their state laws and regulations are at least as stringent as the SMCRA and the Secretary's regulations. *Id.* § 1253. More specifically, the SMCRA provides that a state may assume exclusive jurisdiction over surface coal mining operations only if it has, *inter alia,* (1) "a State law which provides for the regulation of surface coal mining and reclamation operations in accordance with the requirements of [the SMCRA]," 30 U.S.C. § 1253(a)(1); and (2) "a State law which provides sanctions for violations of State laws, regulations, or conditions of permits concerning surface coal mining and reclamation operations, which sanctions shall meet the minimum requirements of [the SMCRA], *including civil and criminal actions....*" *Id.* § 1253(a)(2) (emphasis added).

Therefore, an operator's obligations, in a state that has assumed exclusive jurisdiction over the regulation of surface coal mining and reclamation operations, are determined by state law, state regulations, and a state-issued permit. In addition, the state is responsible for enforcing these obligations. But the SMCRA ensures that both the substantive state regulations and the sanctions for violations are consistent with those of the SMCRA. Thus, even though § 520(f) does not necessarily provide a cause of action in federal court for a violation of a state-issued permit, any person injured by a violation of a state-issued permit has a cause of action for damages in state court pursuant to the state law equivalent of § 520(f). *See, e.g., Haydo v. Amerikohl Mining, Inc.,* 830 F.2d 494, 497–98 (3d Cir.1987) (holding that § 520(f) does not provide federal jurisdiction over suits against operators who are alleged to be in violation of an approved state plan because such suits must be brought in state court); *Ball v. Island Creek Coal Co.,* 722 F.Supp. 1370, 1376 (W.D.Va.1989) (district court in diversity case held that the section of Virginia Code modeled on § 520(f) of the SMCRA provides a damage remedy for violations of state regulations); *Laurel Pipe Line Co. v. Bethlehem Mines Corp.,* 624 F.Supp. 538, 539–41 (W.D.Pa.1986) (holding that § 520(f) provides a cause of action to collect damages for violations of the SMCRA but that because Pennsylvania has assumed exclusive jurisdiction over surface mining operations, the action must be brought in state court pursuant to the state law equivalent of § 520(f)).

Significantly, an operator's liability under § 520(f) appears to be limited only by state workmen's compensation laws. Nothing in the text or the legislative history of § 520(f) indicates that Congress intended other types of state law to limit an operator's liability for damage caused by permit violations. Therefore, I believe that the current subsidence regulation must be interpreted as governing only liability for damage that occurs despite the operator's compliance with the mining permit, because the regulation would be contrary to the damage remedy in § 520(f) (or the equivalent provision of a state SMCRA) if it limited the operator's liability for subsidence damage to structures caused by the operator's permit violation. Thus, even under the current regulations, an operator cannot say that he will take measures to prevent subsidence in order to get a permit and then escape liability for subsidence damage caused by his permit violations. Consequently, I see no reason to hold that the operators' duty to compensate for all subsidence damage to structures is essential to the SMCRA scheme to prevent subsidence.