550 S.E.2d 622

**ANTCO, INC., John Antulov, Margaret Antulov and Steve Antulov, Plaintiffs Below, Appellants**

v.

**DODGE FUEL CORPORATION, Defendant Below, Appellee**

No. 28467.

Supreme Court of Appeals of West Virginia.

Submitted March 7, 2001.

Decided June 29, 2001.

Dissenting Opinion of Justice Davis July 6, 2001.

---

Charles E. Anderson, Esq., Fairmont, West Virginia, Attorney for Appellants.

Jeffrey D. Taylor, Esq., Rose, Padden & Petty, Fairmont, West Virginia, Attorney for Appellee.

McGRAW, Chief Justice:

Appellants, surface owners who claim that mining subsidence damaged their real and personal property, appeal the lower court's grant of summary judgment in favor of a mining company that mined beneath the appellants' property. The lower court found that the appellants' deed contained a valid waiver of subjacent support, and that because of the waiver, the mining company was entitled to allow the surface to subside without any liability for damages to appellants' property. Because we agree that the deed contained a valid waiver, but find that disputed questions of material fact remain unanswered, we affirm in part, and reverse in part, the decision of the trial court.

## I.

## BACKGROUND

John and Margaret Antulov, along with their sons Steve and John Antulov, purchased about 110 acres of land in Marion County, West Virginia, near the Harrison County line, on February 25, 1986. From the record it appears that the property had been strip mined and deep mined before the Antulovs purchased it, but that minable coal remained, both near the surface and in deeper deposits.

The Antulovs purchased the surface tract from Consolidation Coal Company, the deed to which contained a reservation of the mining rights in favor of the grantor. A handwritten notation in the deed limited the reservation to the "deep" mining rights, apparently conveying to the Antulovs the right to mine coal close to the surface. The deed also contained a waiver of subjacent support, and of any liability for any damages caused by subsidence that might result when the coal beneath the property was mined.[1]

---

1. Specifically the deed reserved:
 There is excepted and reserved unto the Grantor or the proper owner thereof, all the several seams of coal and all of the deep [word "deep" inserted by hand and initialed by parties] mining rights and privileges and all constituent products of the coal, in, upon and underlying the said surface lands, including the right to mine and remove and otherwise develop and work and process for market and ship all of the coal now owned, leased or hereafter acquired by the Grantor or the proper owner, by any mining method or machinery now or here-

after employed .... All without being liable for any injury or damage to the surface of the lands and without being required to leave or provide subjacent and lateral support for the overlying and adjoining strata or surface or anything therein or thereon including structures or improvements now or hereafter erected thereon and water or water courses therein or thereon, and without being liable for any surface damage and damages of any sort howsoever caused or arising from the removal of, and all operation in connection with mining

While we have often been asked to address disputes between surface owners and mineral owners, this is not the typical surface owner versus mining company case, because the surface owners in this case, the Antulovs, were also in the coal business. The four were joint owners in a family business called Antco, Inc., which they used to strip mine the property.[2] After mining coal for a time, the Antulovs determined that it would be more profitable for them to mine limestone than coal, so they began a quarry operation on the property.

The Antulovs purchased a used rock crusher, moved it to the property, and reassembled it. Because the crusher was a large machine that exerted enormous force when operating, the Antulovs had to support it on a platform they constructed out of steel I beams secured to large pipes driven into bedrock. They operated the quarry for some time, producing commercial limestone for various customers. The amount of revenue this operation produced is the subject of some debate between the parties.

Though not clear in the record, at some point the Antulovs were approached by representatives from Dodge Fuel Corporation (hereafter "Dodge"), or a related entity, who either then possessed, or were planning to soon acquire, the right to mine the deep coal under the Antulovs' property. These representatives proposed that the Antulovs join them in a venture to mine the remaining deep coal under the property. The Antulovs agreed and became part owners in Dodge Fuel Corporation. The Antulovs were to perform some excavation related to the deep mine, and were to assist in obtaining the necessary mining permits to conduct the operation.[3]

Dodge acquired the rights to the coal from Bellwood Mining Company by agreement and lease dated September 17, 1993. Subsequently, Dodge applied for and received a permit from the West Virginia Department of Environmental Protection (hereafter "DEP") to commence secondary mining operations beneath the Antulov property.[4] West Virginia mining regulations, discussed *infra*, require any mining company to provide, in its permit application, detailed pre-mining information about the possible consequences of mining-related subsidence.

In an attachment to its permit, Dodge stated:

(6) Even though the operator does not believe that subsidence will cause material damage or diminution in value or foreseeable use of the land or structures over the proposed deep mine. [*sic*] The operator acknowledges that if subsidence causes material damage or reduces the value or reasonably foreseeable use of the surface lands, the operator shall restore the land to a condition capable of supporting uses it was capable of supporting before subsidence *regardless of the right to subside.* (emphasis added)

(7) *The quarry that the deep mine intends to undermine will be protected* by leaving at least 50% of the coal in place in the area under the quarry. (emphasis added)

In all other areas of planned subsidence surface measures (repair of the damaged surface) will be taken to prevent material damage or lessening of the value or reasonably foreseeable use of the surface.

During the time that Dodge conducted mining beneath the Antulov property, DEP cited Dodge[5] with Notices of Violation

said coal by the Grantor or the proper owner . . . .

**2.** At some point, one brother, John Antulov, relinquished his ownership in Antco, Inc., leaving the three named appellants.

**3.** It is unclear if Dodge Fuel Corporation existed before this time, or was formed as a new entity specifically for the purpose of mining beneath the Antulovs' property.

**4.** Again, there is a dispute between the parties as to who acquired the permits for the mining operation.

**5.** Dodge maintains in its brief that it was actually "Antco, Inc.," that received the permit and conducted much of the mining, and that it was "Antco, Inc.," that received these Notices of Violation from DEP. Because appellees prevailed on summary judgment, we must view the facts in the appellants' favor. "[W]here varying inferences may be drawn from the same evidence, we must view the underlying facts in a light most favorable to the non-moving party." *Armor v.*

for: 1) failing to adopt a subsidence control plan with a satisfactory "angle of draw" (a term of art relating to the estimation of the area of the subsidence)[6] and 2) conducting mining operations outside the boundaries described on Dodge's approved map.[7]

The Antulovs claimed before the circuit court that Dodge failed to follow the requirements of its permit and undermined the land beneath their rock quarry, which Dodge had specifically promised not to do in its permit application. The Antulovs claim that this violation of the permit produced subsidence that damaged their equipment, thereby making it economically unfeasible to continue their quarry operations. As a result, the Antulovs claim direct damages for the lost equipment as well as lost profits from their business.

Dodge argued below that the deed held by the Antulovs for the surface contains a clear waiver of subjacent support, and thus forecloses the Antulovs from maintaining this action for damages. That is to say, that despite any statements made in its permit application, Dodge claimed it had the right to mine and to cause the land to subside, within the limits of our mining law, without any liability for any damage to the Antulovs' quarry equipment.

The Circuit Court of Marion County agreed with Dodge. The court granted summary judgment in favor of Dodge, finding that the Antulovs' deed of February 26, 1986, was and remains valid, and "clearly and conclusively demonstrates the intention of [the Antulovs] to waive any right to subjacent and lateral support . . . ." and that, as a result of this finding, no genuine issue of material fact

existed. While we agree that this relatively recent waiver of subjacent support contained in the 1986 deed was valid and affirm the lower court on this issue, we find that questions of material fact exist with regard to Dodge's violations or alleged violations of its mining permit, and reverse on that basis.

## II.

### STANDARD OF REVIEW

We have routinely declared our standard of review for a lower court's grant of summary judgment:

"A circuit court's entry of summary judgment is reviewed *de novo*." Syl. pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). A party moving for summary judgment faces a well-established burden: "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Cas. & Surety Co. v. Federal Insur. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

*Mallet v. Pickens*, 206 W.Va. 145, 147, 522 S.E.2d 436, 438 (1999). We have also noted that, "[i]n determining on review whether there is a genuine issue of material fact between the parties, this Court will construe the facts 'in a light most favorable to the losing party,'" *Alpine Property Owners Association, Inc., v. Mountaintop Development Company*, 179 W.Va. 12, 17, 365 S.E.2d 57, 62 (1987) (quoting *Masinter v. WEBCO Co.*,

*Lantz*, 207 W.Va. 672, 677, 535 S.E.2d 737, 742 (2000) (citing *Painter v. Peavy*, 192 W.Va. 189, 192, 451 S.E.2d 755, 758 (1994)). Thus we need not address this contention, but we do note that a factual dispute such as this, concerning who actually controlled the mining operation, is not compatible with a grant of summary judgment.

**6.** Because subsidence extends laterally beyond the area actually undermined, adjacent surface land is affected as well. Somewhat like the sides of a shallow trench dug in the sand on a beach tend to collapse inward, land adjacent to the undermined area may be dragged downward as the roof over a mined area collapses. When combined with the known depth of the mining

activity, the angle of draw can be used to predict the general area where subsidence can be expected to occur. *See generally*, Joshua I. Barrett, *Longwall Mining and SMCRA: Unstable Ground for Regulators and Litigants*, 94 W. Va. L.Rev. 693 (1992).

**7.** It appears that the Antulovs argue that this "over-mining" outside the approved area was connected to the subsidence that allegedly damaged their property. It is unclear from our review of the record whether the "over-mining" cited by the DEP actually occurred beneath or near the quarry or not.

# 650

164 W.Va. 241, 242, 262 S.E.2d 433, 435 (1980)).

## III.

## DISCUSSION

We remark at the outset that this case turns not upon the validity of waivers of subjacent support, but rather upon Dodge's violation of specific promises or statements made in its permit application. As we discuss below, a proper waiver and adherence to state and federal mining regulations can allow a mining company to cause subsidence, and in certain cases damage surface structures without incurring liability. The cynosure of this case is how Dodge's actions may have, in effect, invalidated or limited an otherwise valid waiver of subjacent support.

## A.

### *Applicability of the West Virginia Surface Coal Mining and Reclamation Act*

■ Appellants ask us to review the conduct of the appellees in light of the West Virginia Surface Coal Mining and Reclamation Act ("WVSCMRA"), now found at W. Va.Code § 22–3–1, *et seq.*[8] Our Legislature has declared that the goal of our mining regulations is to strike a proper balance between a healthy environment and a healthy economy, and that mining may not be pursued to the detriment of all else:

Further, the Legislature finds that unregulated surface coal mining operations may result in disturbances of surface and underground areas that burden and adversely affect commerce, public welfare and safety by destroying or diminishing the utility of land for commercial, industrial, residential, recreational, agricultural and forestry purposes; by causing erosion and landslides; by contributing to floods; by polluting the water and river and stream beds; by destroying fish, aquatic life and wildlife habitats; by impairing natural beauty; by damaging the property of citizens; by creating hazards dangerous to life and property; and by degrading the quality of life in local communities, all where proper mining and reclamation is not practiced.

W. Va.Code, § 22–3–2 (1994).[9] Thus we take notice that the West Virginia Surface Coal Mining and Reclamation Act, W. Va.Code § 22–3–1, *et seq.*, is remedial legislation that has as one of its primary purposes the protection of the public from the potentially destructive effects that mining may have on our lands, forests and waterways.

■ Furthermore, even though the Act contains the word "surface" in its title it clearly still applies to the facts of this case, and to underground mining operations in general. The definitions section of the statute provides:

(u) "Surface mine," "surface mining," or "surface mining operations" means:

(1) Activities conducted on the surface of lands for the removal of coal, or, subject to the requirements of section fourteen of this article, surface operations and *surface impacts incident to an underground coal mine,* including the drainage and discharge from the mine. The activities include: Excavation for the purpose of obtaining coal, including, but not limited to, common methods as contour, strip, auger, mountaintop removal, box cut, open pit and area mining; the uses of explosives and blasting; reclamation; in situ distillation or retorting, leaching or other chemical or physical processing; the cleaning,

---

8. Our Act (codified in the past at § 22A–3–1, *et seq.*) has evolved alongside federal legislation, the history of which we discussed at some length in another case:

In 1979, the Office of Surface Mining Reclamation and Enforcement ("OSM"), an agency within the United States Department of the Interior, initially developed regulations for underground mines pursuant to the Surface Mining Control and Reclamation Act ("SMCRA"), 30 United States Code Annotated §§ 1201 to 1328 (West 1986). 44 Fed.Reg. 14902 (March 13, 1979).

*Schultz v. Consolidation Coal Company,* 197 W.Va. 375, 380, 475 S.E.2d 467, 472 (1996), *cert. denied,* 519 U.S. 1091, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997).

9. Our Act also stresses the importance of assuring "that the coal production essential to the nation's energy requirements and to the state's economic and social well-being is provided." W. Va.Code § 22–3–2(b)(8) (1994).

concentrating or other processing or preparation and loading of coal for commercial purposes at or near the mine site; and

(2) The areas upon which the above activities occur *or where the activities disturb the natural land surface.* The areas also include any adjacent land, the use of which is incidental to the activities....

W. Va.Code § 22–3–3 (2000) (emphasis added). The definitions of "surface mine," "surface mining," or "surface-mining operations" contained within the West Virginia Surface Coal Mining and Reclamation Act, W. Va. Code § 22–3–1, *et seq.,* include "surface impacts incident to an underground coal mine," and areas "where such activities disturb the natural land surface." The Act was intended to encompass the surface impacts of underground mining as well as surface mining.[10] Thus it applies to the case at hand.

Also, we note that private citizens may sue a mining company under the Act. The plain language of the West Virginia Surface Coal Mining and Reclamation Act allows private suits against mining companies:

Any person or property who is injured through the violation by any operator of

any rule, order or permit issued pursuant to this article may bring an action for damages, including reasonable attorney and expert witness fees, in any court of competent jurisdiction. Nothing in this subsection affects the rights established by or limits imposed under state workers' compensation laws.

W. Va.Code § 22–3–25(f) (1994).[11]

## B. *Validity of Waiver*

■■■ We have in the past found existing waivers of the right of subjacent or lateral support to be valid, provided that the language of the deed and the circumstances surrounding the conveyance show a clear intention by the surface owner to waive such support:

Under the West Virginia common law of property, the well recognized and firmly established rule is that when a landowner has conveyed the minerals underlying the surface of his land, he retains the right to the support of the surface in its natural state, but the owner of land may release or waive his property right of subjacent support by the use of language that clearly shows that he intends to do so; however,

---

**10.** Previously we have found that a particular subsection of the Act dealing with the duty of a mining company to replace a landowner's water supply did not apply to underground mining operations. In that case, owners of a surface tract in Braxton County complained that an underground mining operation destroyed their water supply and damaged their land by causing it to subside. We found: "Consequently, we conclude that neither W. Va.Code, 22A–3–24(b), of the WVSCMRA nor its federal counterpart in 30 U.S.C. § 1307 of the SMCRA relating to the replacement of surface water, is applicable to the operation of an underground coal mine." *Rose v. Oneida Coal Co., Inc.,* 195 W.Va. 726, 731, 466 S.E.2d 794, 799 (1995) (*Oneida II* ).

Although our reading of the Act in this opinion seems somewhat at odds with that conclusion, we are not faced today with a question over the applicability of the Act to a claim for a damaged water supply. We restrict our discussion to the facts at issue in this case.

**11.** This specific provision obviates any need for us to look for an implied private cause of action, though we have done so in the past. In a recent wrongful death case related to the alleged routine and continual overloading of limestone trucks, we discussed the relationship between a violation of statute and an injured party's rights to maintain an action:

When a statute imposes a duty on a person for the protection of others, it is a public safety statute and a violation of such a statute is *prima facie* evidence of negligence unless the statute says otherwise. A member of a class protected by a public safety statute has a claim against anyone who violates such a statute when the violation is a proximate cause of injury to the claimant.

Syl. pt. 7, *Shaffer v. Acme Limestone Co., Inc.,* 206 W.Va. 333, 524 S.E.2d 688 (1999). We went on in that case to hold that the statute at issue was a public safety statute "for which a private cause of action may be maintained for injury or harm resulting from its violation." *Id.,* syl. pt. 8, 524 S.E.2d 688. We made a similar finding regarding bad faith claims against an insurance company in another case:

An implied private cause of action may exist for a violation by an insurance company of the unfair settlement practice provisions of W. Va. Code, 33–11–4(9); but such implied private cause of action cannot be maintained until the underlying suit is resolved.

Syl. pt. 2, *Jenkins v. J.C. Penney Cas. Ins. Co.,* 167 W.Va. 597, 280 S.E.2d 252 (1981), *overruled in part by, State ex rel. State Farm Fire & Cas. Co. v. Madden,* 192 W.Va. 155, 451 S.E.2d 721 (1994).

this law has been modified to some extent by the enactment of the West Virginia Surface Coal Mining and Reclamation Act, W. Va.Code, 22A–3–1 [1985], *et seq.* and the extent of such modification will be ruled upon when properly presented.

Syllabus, *Rose v. Oneida Coal, Co. Inc.,* 180 W.Va. 182, 375 S.E.2d 814 (1988) (*Oneida I* ). However, we have also noted that a waiver is only valid insofar as the proposed activity was within the contemplation of the original parties:

"A release ordinarily covers only such matters as may fairly be said to have been within the contemplation of the parties at the time of its execution." Syllabus Point 2, *Conley v. Hill,* 115 W.Va. 175, 174 S.E. 883 (1934), *overruled on other grounds, Thornton v. Charleston Area Medical Center,* 158 W.Va. 504, 213 S.E.2d 102 (1975).

Syl. pt. 3, *Cogar v. Sommerville,* 180 W.Va. 714, 379 S.E.2d 764 (1989).

In *Cogar,* the mining company wished to conduct surface operations within 300 feet of an occupied dwelling, which, absent a proper waiver, is prohibited by the Act. Although the mining company was the beneficiary of broad form waivers in deeds drafted in the early 1900's, we found that the old, broad form waivers were not sufficient under the modern Act. Consequently we held: "A waiver of damages provision contained in a broad form coal severance deed is not the type of explicit waiver contemplated by and required by W. Va.Code 22A–3–22(d)(4), before mining operations can be lawfully conducted within three hundred feet of an occupied dwelling." Syl. pt. 4, *Cogar v. Sommerville,* 180 W.Va. 714, 379 S.E.2d 764 (1989).

However, the waiver in the instant case is contained in a deed executed in 1986, and was agreed to by surface owners who were experienced in the coal mining business. Thus, we are hard pressed to find any flaw with the waiver in the Antulovs' deed, and concur with the circuit court as to the waiver's validity.

## C.

### Appellants' Claims Under the Energy Policy Act of 1992

Appellants argue that the lower court erred when it held that recent federal legisla-tion and subsequent federal court decisions did not apply to this case and did not create a strict liability standard for subsidence damage. Essentially, appellants assert that changes in federal law have invalidated all waivers of subjacent support. Appellants call our attention to the federal Energy Policy Act of 1992 and the related federal case of *National Mining Association v. Bruce Babbitt,* 172 F.3d 906 (D.C.Cir.1999).

### i.

### *Supremacy of Federal Law*

■ We explained in a recent case the interrelated nature of the state and federal mining law.

Under the statutory scheme of SMCRA [Surface Mining Control and Reclamation Act], the states are given a choice as to whether they wish to regulate surface mining activities that occur within their respective boundaries. See 30 U.S.C. § 1253. Any state that opted to assume regulatory control of its surface mining activities was required by the provisions of SMCRA to submit a state program to OSM for approval "which demonstrates that such State has the capability of carrying out the provisions of this chapter [25] and meeting its purposes ...." *Id.* West Virginia, like many other states, decided to regulate its own surface mining activities and submitted a state plan which was approved by OSM. Under federal law, any subsequent changes to that approved state plan must also be approved by OSM, as we recognized in syllabus point three of *Schultz.*

*DK Excavating, Inc. v. Miano, Director DEP,* 209 W.Va. 406, 409, 549 S.E.2d 280, 283 (2001) (footnotes omitted).

The Energy Policy Act, federal legislation, contains, *inter alia,* a requirement that a mining company compensate the owner of certain surface structures for damage caused by subsidence, without regard to any waiver of subjacent support. Appellants argue that this Act should permit them to recover in this case.

To the contrary, appellee Dodge argues that our case of *Schultz v. Consolidation Coal Company*, 197 W.Va. 375, 475 S.E.2d 467 (1996), *cert. denied*, 519 U.S. 1091, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997), prohibits the Antulovs from recovery in this case. In *Schultz*, the plaintiffs likewise argued that a mining company was liable to them for damages to their surface structures because of changes in federal law. In that case we retraced the development of the law on that issue, and based upon the most recent federal case at that time, we found that the plaintiffs were not entitled to a reversal of the summary judgment that the lower court had granted the mining company.

■ In *Schultz*, the plaintiffs had relied upon the federal district case of *National Wildlife Federation v. Lujan*, 733 F.Supp. 419 (D.C.1990), *rev'd*, 928 F.2d 453 (D.C.Cir. 1991) (hereinafter *"Lujan I"*). The district court had ruled that an operator had a duty under the Act to repair or compensate an owner for subsidence damage to structures regardless of any waiver under state common law. But before the plaintiffs reached this Court, the federal appeals court reversed in *National Wildlife Federation v. Lujan*, 928 F.2d 453 (D.C.Cir.1991) (hereinafter *"Lujan II"*). Though the plaintiff argued that, at the precise time of their dealings with the defendant, the more favorable law applied, we held otherwise, underlining the impact of the federal law and regulations upon our own law and regulations:

> A state regulation enacted pursuant to the West Virginia Surface Coal Mining and Reclamation Act, West Virginia Code §§ 22A–3–1 to –40 (1993) [now W. Va. Code § 22–3–1, *et seq.*], must be read in a manner consistent with federal regulations enacted in accordance with the Surface Mining Control and Reclamation Act, 30 United States Code Annotated §§ 1201 to –1328 (1986).

Syl. pt. 5, *Schultz v. Consolidation Coal Company*, 197 W.Va. 375, 475 S.E.2d 467 (1996), *cert. denied*, 519 U.S. 1091, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997).

■ *Schultz* was based in part upon our holding in another case, *Canestraro v. Faerber*, 179 W.Va. 793, 374 S.E.2d 319 (1988).

In *Canestraro*, a group of citizens wanted local access to permit applications for the expansion of a coal waste dam. They argued that the federal law required permit applications to be filed in the courthouse in the county where the mining was to take place, but our state law only required that permits be kept on file in one of six Department of Energy offices. We noted that the federal rules require our state program to comply with the federal Act and quoted from the federal rules:

> "States with an approved State program shall implement, administer, enforce and maintain it in accordance with the Act, this chapter, and the provisions of the approved State program."

This regulation requires the State to abide not just by the provisions of the state program, but also by the provisions of SMCRA and regulations promulgated pursuant to SMCRA. In a case such as this, when there is a conflict between the federal and state provisions, the less restrictive state provision must yield to the more stringent federal provision notwithstanding the administrative approval of the state law by OSM.

*Canestraro v. Faerber*, 179 W.Va. 793, 795, 374 S.E.2d 319, 321 (1988) (quoting 30 C.F.R. § 733.11 (1979)). We explained that the statute, as well as the federal regulation, commands state compliance with the federal law:

> Clearly, Congress intended that state provisions be no less stringent or effective than the federal provisions. But what if a state law is approved that is less stringent or effective? The federal act further provides in 30 U.S.C. § 1255(a), titled "State Laws" that:
>
> "(a) No State law or regulation in effect on the date of enactment of this Act [enacted Aug. 3, 1977] or which may become effective thereafter, shall be superseded by any provision of this Act or any regulation issued pursuant thereto, *except insofar as such State law or regulation is inconsistent with the provisions of this Act.*" [Emphasis added].

*Canestraro v. Faerber*, 179 W.Va. 793, 795, 374 S.E.2d 319, 321 (1988) (quoting 30 U.S.C.

§ 1255(a) (1977)). We summarized this line of reasoning with our first syllabus point in *Canestraro:*

> When a provision of the West Virginia Surface Coal Mining and Reclamation Act, W. Va.Code, 22A–3–1 *et seq.,* [now W. Va. Code § 22–3–1, *et seq.*] is inconsistent with federal requirements in the Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201 *et seq.,* the state act must be read in a way consistent with the federal act.

*Id.,* Syl. pt. 1, 374 S.E.2d 319.

These holdings are entirely consistent with the fundamental law of our State. Because of the circumstances of our State's formation, the first command of our Constitution is:

1. Relations to the Government of the United States

> ■ The State of West Virginia is, and shall remain, one of the United States of America. The Constitution of the United States of America, and the laws and treaties made in pursuance thereof, shall be the supreme law of the land.

W. Va. Const. Art. I, § 1. We noted as much in *DK Excavating, supra,* and went on in that case to hold:

> Once a state plan is approved under the federal Surface Mining Control and Reclamation Act, any subsequent amendments to such plan do not become effective until approved by the federal Office of Surface Mining, and may not be approved by the Office of Surface Mining if inconsistent with the Surface Mining Control and Reclamation Act.

Syl. pt. 3, *DK Excavating, Inc. v. Miano, Director DEP,* 209 W.Va. 406, 549 S.E.2d 280 (2001). Finally, the director of the Federal Office of Surface Mining has the authority to take over all or portions of our state program if it fails to satisfy the requirements of federal law:

> (b) Inadequate State enforcement; notice and hearing
>
> [I]f he further finds that the State has not adequately demonstrated its capability and intent to enforce such State program, he shall give public notice of such finding. During the period beginning with such public notice and ending when such State satisfies the Secretary that it will enforce this chapter, the Secretary shall enforce, in the manner provided by this chapter, any permit condition required under this chapter, shall issue new or revised permits in accordance with requirements of this chapter, and may issue such notices and orders as are necessary for compliance therewith. . . .

30 U.S.C. § 1271(b) (1977). Bearing in mind the supremacy of the federal law, we examine appellants' argument.

### ii.

### Subsidence Damages Under the Energy Policy Act

As we stated, in *Schultz* we rejected the plaintiffs' argument that a change in federal law protected them from subsidence damage. However, in the instant case the appellants argue that more recent changes to federal law made by The Energy Policy Act entitle them to recovery for their damages. SMCRA now provides:

> Underground coal mining operations conducted after October 24, 1992, shall comply with each of the following requirements:
>
> (1) Promptly repair, or compensate for, material damage resulting from subsidence caused to any occupied residential dwelling and structures related thereto, or non-commercial building due to underground coal mining operations. Repair of damage shall include rehabilitation, restoration, or replacement of the damaged occupied residential dwelling and structures related thereto, or non-commercial building. Compensation shall be provided to the owner of the damaged occupied residential dwelling and structures related thereto or non-commercial building and shall be in the full amount of the diminution in value resulting from the subsidence. Compensation may be accomplished by the purchase, prior to mining, of a noncancellable premiumprepaid insurance policy.

30 U.S.C. § 1309a (1992). Although the statute is silent as to the effect waivers may have on the outcome of a dispute, the one federal

case directly on point, also authored by the District of Columbia Court of Appeals, clarifies the issue:

> We previously upheld the government's limitation of the obligation to repair or compensate for damage to structures only to the extent required by state law, *see National Wildlife Fed'n v. Lujan,* 928 F.2d at 457–59, in part because the Mining Act at the time did not explicitly impose an obligation to compensate for such damage, *see id.* at 458 n. 3. The Energy Policy Act imposes just such an obligation on its face. *See* 30 U.S.C. § 1309a(a)(1) ("Compensation shall be provided to the owner of the damaged occupied residential dwelling and structures related thereto or non-commercial building *and shall be in the full amount of the diminution in value resulting from the subsidence.*") (emphasis added). It is therefore wholly consistent with the statute—indeed it might even be mandated—for the Secretary to require the mining companies further to compensate landowners for damages to which the new federal law entitled them.

*National Mining Association v. Babbitt,* 172 F.3d 906, 916–17 (D.C.Cir.1999).

We agree with appellants that the federal law has developed since *Schultz* and *Lujan II,* with respect to damage to residential dwellings and non-commercial buildings. However, in the case before us, there is no allegation that the mining activity damaged an occupied residential dwelling or non-commercial building. Appellants make the argument that the language of the federal Energy Policy Act effectively creates a strict liability standard for subsidence damage to *any* surface structure. However, in light of the specific language in the federal legislation, and because the dispute before us concerns a commercial rock crusher, we decline to apply the *Babbitt* decision to the facts of this case.[12]

## D.

### *Violation of Permit as Evidence of Negligence*

 Finally, appellants argue that, in lieu of a strict liability theory, they should be entitled to recover under a negligence theory, based upon violations of the mining permit. That is, appellants claim that any alleged violation of the mining permit, which may or may not have been pursued by the DEP, may also serve as *prima facie* evidence of the mining company's negligence.

Dodge counters that it matters not whether it committed any negligence, because the waiver of subjacent support entitles Dodge to mine, allow subsidence, and damage certain property or structures upon the surface. Dodge claims to have a *right* to be negligent if it chooses, i.e. the waiver of support makes

---

**12.** In the alternative, Appellants argue that our administrative rules require repairs to "structures or facilities" without drawing any distinction between commercial and noncommercial property, and cite to the West Virginia Code of State Rules:

> 16.2.c Material Damage. Material Damage in the context of this section and 3.12 of this rule means: any functional impairment of surface lands, features, structures or facilities .... The operator shall: ...
> 16.2.c.2 Either correct material damage resulting from subsidence caused to any structures or facilities by repairing the damage or compensate the owner of such structures or facilities in the full amount of the diminution in value resulting from the subsidence....

38 W. Va.C.S.R. §§ 2–16.2.c to 16.2.c.2 (2000) (emphasis added). Appellants point out that the federal rules do not foreclose the possibility that state law may offer a surface owner greater protection:

> The permittee must promptly repair, or compensate the owner for, material damage resulting from subsidence caused to any noncommercial building or occupied residential dwelling or structure related thereto that existed at the time of mining....
> The permittee must, *to the extent required under applicable provisions of State law,* either correct material damage resulting from subsidence caused to any structures or facilities not protected by paragraph (c)(2) of this section by repairing the damage or compensate the owner of the structures or facilities for the full amount of the decrease in value resulting from the subsidence.

30 C.F.R. § 817.121(c)(2)-(c)(3) (1995). Appellants argue that, although the federal rules make specific mention of noncommercial structures, the state rules do not. Because the state rules do not limit themselves to noncommercial structures, appellants claim the state rules must cover commercial structures (e.g. the rock crusher) as well. However, because we find for the appellants on other grounds, we decline to address this particular argument in this opinion.

any argument about negligence superfluous because it can cause subsidence if it so chooses. Dodge may or may not have had such rights before the permit. However, to ignore the permit and accept Dodge's argument at face value would be to eviscerate the entire permitting process.

Permits are elaborately crafted documents, that in many cases display the art of the compromise. A mining company may agree in a permit to limit mining in some way or make other concessions that are not required by the letter of the law. A mining company may choose, for whatever reason, to promise certain activity that the law does not absolutely require. But even if not required by the law, once the state accepts and approves those promises, they become terms and conditions of the permit, and the mining company must honor them.

■■■ Although a mining company may have a variety of rights by virtue of deed reservation or contractual arrangement, a company remains free to waive or limit those rights during the permitting process. We hold that the terms and conditions of a mining permit issued pursuant to the West Virginia Surface Coal Mining and Reclamation Act, W. Va.Code § 22–3–1, *et seq.*, may limit rights that a mining company otherwise would have enjoyed. Mining activity may not exceed the limitations contained in the permit, or any other statutory limitation.

■■■ One must have a permit in order to mine, and when one violates the terms of a permit, the state may assess a penalty. "Any person engaged in surface-mining operations who violates any permit condition or who violates any other provision of this article or rules promulgated pursuant thereto may also be assessed a civil penalty. . . ." W. Va.Code § 22–3–17(c) (1997). Technically it is the permit, and not a specific statutory provision, that requires a company to do or not do certain things. However, if the company does otherwise and violates its permit, it clearly is also violating a statute, namely the Act. Thus we hold that, because a mining company must have a valid permit to mine, a violation of the terms or conditions of a permit issued pursuant to the West Virginia Surface Coal Mining and Reclamation Act,

W. Va.Code § 22–3–1, *et seq.*, is a violation of the Act, and therefore a violation of statute.

■■■ We have long held that any violation of statute is considered *prima facie* evidence of negligence, and have explained how such evidence should be used by a court: "Violation of a statute is *prima facie* evidence of negligence. In order to be actionable, such violation must be the proximate cause of the plaintiff's injury ." Syl. pt. 1, *Anderson v. Moulder*, 183 W.Va. 77, 394 S.E.2d 61 (1990). Once the violation of statute is established, a court should allow a jury to consider the case:

> A *prima facie* case of actionable negligence is that state of facts which will support a jury finding that the defendant was guilty of negligence which was the proximate cause of plaintiff's injuries, that is, it is a case that has proceeded upon sufficient proof to the stage where it must be submitted to a jury and not decided against the plaintiff as a matter of law.

Syl. pt. 6, *Morris v. City of Wheeling*, 140 W.Va. 78, 82 S.E.2d 536 (1954).

In this case, the Antulovs have alleged that Dodge violated the specific terms and conditions of its permit in several ways, most notably by undermining their quarry and causing subsidence that damaged their equipment. It is the language of the permit, and not the waiver, that controls this dispute. The Antulovs should be able to present evidence that Dodge's actions caused their damages. This inquiry concerns disputed issues of material fact; thus, we conclude that the lower court erred in granting summary judgment in favor of Dodge.

## IV.

## CONCLUSION

For the reasons stated, the judgment of the Circuit Court of Marion County is affirmed, in part, and reversed, in part, and is remanded for further proceedings consistent with this opinion.

Affirmed, in part, reversed, in part, and remanded.

DAVIS, Justice, dissenting:

(Filed July 6, 2001)

This case involves the simple question of whether or not a waiver executed in a deed was valid. The majority concedes that the deed waiver is valid. The opinion should have ended with that determination. Nevertheless, the majority goes on to conclude that parties who have waived their rights to sue for subsidence can, notwithstanding a valid deed waiver, sue for damages resulting from subsidence where there has been a permit violation. On this point I must respectfully disagree.[1]

The majority has addressed this as an issue of Dodge Fuel Corp.'s rights, and apparently found that Dodge Fuel could, by virtue of the permit process, waive its right to not be sued. I believe the Majority took the wrong approach. It is not Dodge Fuel's rights that are in question here, it is Antco's. Certainly W. Va.Code § 22-3-25(f) (1994) (Repl.Vol.1998) grants to Antco the right to sue Dodge Fuel for permit violations causing subsidence damage to Antco. It is Antco, however, who waived that right in the deed. Dodge Fuel was entitled to rely on Antco's waiver and to conduct itself accordingly. Consequently, Antco should be estopped from pursing a cause of action against Dodge Fuel to collect for its subsidence damages. *See Ara v. Erie Ins. Co.*, 182 W.Va. 266, 270, 387 S.E.2d 320, 324 (1989) ("Estoppel is properly invoked to prevent a litigant from asserting a claim or a defense against a party who has detrimentally changed his[/her] position in reliance upon the litigant's misrepresentation or failure to disclose a material fact."); *See also Webb v. Webb*, 16 Va.App. 486, 494, 431 S.E.2d 55, 61 (1993) ("Estoppel

is the doctrine by which a 'party is prevented by his own acts from claiming a right to [the] detriment of [the] other party who was entitled to rely on such conduct and has acted accordingly.' " (quoting Black's Law Dictionary 551 (6th ed.1990))); Black's Law Dictionary 571 (7th ed.1999) (defining "estoppel by deed" as "[e]stoppel that prevents a party to a deed from denying anything recited in that deed if the party has induced another to accept or act under the deed . . . ."). *Cf Id.* (defining "estoppel by contract" as "[a] bar against a person' denying a term, fact, or performance arising from a contract that the person has entered into."). The Majority's rule to the contrary unfairly deprives parties of the benefits of their bargains.

A coal operator should be entitled to rely on a valid deed waiver. This Court has held, and the Majority recognizes, that deed waivers are valid in this state. *See* Maj. Op. at 629 – 630. It is patently unfair to maintain that deed waivers are permitted under state law, yet render them ineffective after-the-fact due to the very conduct that was the subject of the waiver. Stated another way, under the Majority opinion a landowner may sell the sub-surface mineral rights to his or her property and obtain an optimum sales price by executing a waiver of subsidence damage in the deed. The surface landowner may then obtain a second, windfall, recovery for the previously anticipated subsidence damage by instituting a civil suit based upon a permit violation.[2] Thus, the unsuspecting coal operator has paid for a meaningless waiver. Furthermore, due to the operator's reliance on the waiver, it has been deprived of alternatives that it likely would have pursued had it known of the ineffectiveness of the waiver, such as not entering the agree-

---

**1.** I would also disagree that Antco should be permitted to pursue a cause of action for damage to a piece of equipment as a result of a permit violation. The Majority opinion indicates that the permit did not in any way contemplate damage to surface *equipment*. However, a review of Antco's complaint reveals that it did not sue for damage to a piece of equipment. Rather, Antco sought damages for "subsidence on the surface property of the Plaintiffs['], causing the closing of the 'Quarry' of Antco, Inc. and depriving the surface owners, John Antulov and Steve Antulov, of royalties from the mining and extraction of limestone on the property."

**2.** Rephrased in the context of the facts of the present case, a land owner/coal operator may sell land while reserving the sub-surface mineral rights. The buyer may obtain the surface land at a bargain rate by executing a waiver of subsidence damage in the deed. Having already received the benefit of a reduced price in exchange for relinquishing the right to recover for subsidence damage, the surface landowner may then obtain a windfall recovery for previously anticipated subsidence damage that actually occurs by suing on a theory of a permit violation.

ment in the first instance, negotiating a better price in the absence of a waiver, or conducting itself more carefully so as to not cause subsidence damage.[3]

The Majority maintains that not allowing Antco to pursue this cause of action would effectively "eviscerate the entire permitting process." Maj. Op. at 634. What the majority fails to acknowledge, however, is that the proper remedy for Dodge Fuel's permit violations is found in W. Va.Code § 22–3–17 (1997) (Repl.Vol.1998). Pursuant to this statute, the director of the Division of Environmental Protection has a mandatory duty to take certain actions in response to permit violations. For example, under some circumstances the director must order "the cessation of the operation or the portion thereof causing the violation." W. Va.Code § 22–3–17(a). There also may be imposed a "mandatory civil penalty of not less than seven hundred fifty dollars per day per violation." *Id.* Where there is a pattern of violations of a permit, the director may cause the coal operator's permit to be revoked and the entire amount of the operator's bond to be forfeited. W. Va.Code § 22–3–17(b).

For these reasons, I believe that Antco should have been estopped from pursing its action against Dodge Fuel, and the circuit court's order granting partial summary judgment to Dodge Fuel should have been affirmed. I am authorized to state that Justice Maynard joins me in this dissenting opinion.

---

3. The Majority opinion appears to have far reaching implications for businesses who have been operating under deed wavers and who, depending upon the language contained in their mining permits, are now exposed to liability for subsidence.